**FILED**

SEP **18** 2014

U.S. DISTRICT COURT-WVND
CLARKSBURG, WV 26301

CASSANDRA NICOLE HINKLE,

      Plaintiff,

v.                                  Civil Action No. 3:14cv41
                                  (The Honorable Gina M. Groh)

COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## REPORT AND RECOMMENDATION/OPINION

     This is an action for judicial review of the final decision of the Commissioner of the Social

Security Administration ("Defendant" and sometimes "the Commissioner") denying Cassandra Nicole

Hinkle's ("Plaintiff") claim for supplemental security income benefits ("SSI") under Title XVI of the

Social Security Act. The matter is awaiting decision on cross motions for summary judgment and has

been referred to the undersigned United States Magistrate Judge for submission of proposed findings

of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P.

9.02.

## I. PROCEDURAL HISTORY

     Plaintiff filed her application for SSI benefits on January 27, 2011, alleging disability since

September 30, 2009, due to severe depression, anxiety, diabetes, seizures, and hypercholesterolemia

(R. 109, 137).[1] The state agency denied her claim initially and on reconsideration (R. 53-54). At

Plaintiff's request, an administrative hearing was conducted by Karl Alexander, Administrative Law

---

[1] In her brief, Plaintiff has only presented arguments regarding her mental limitations.
Accordingly, the undersigned has focused solely on Plaintiff's medical records concerning her
mental limitations, not physical limitations, for the relevant time period.

Judge ("ALJ"), on July 12, 2012, and at which Plaintiff, who was represented by counsel, and Eugene Czuczman, a Vocational Expert ("VE"), testified (R. 33-52). On August 28, 2012, the ALJ issued a decision finding Plaintiff was not disabled (R. 11-21). Plaintiff timely appealed the ALJ's decision to the Appeals Council, which denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-4).

## II.  FACTS

Plaintiff was born on April 23, 1991, and was eighteen (18) years old on her onset date (R. 109). Plaintiff had no work history (R. 38).

Plaintiff was examined by Dr. Chua on October 14, 2009. She was oriented. Her mood and affect were normal. Except for nervousness, Plaintiff's examination was normal. She was "wringing hands" and had "a flat affect" (R. 401, 403, 405). Plaintiff reported suicidal ideations. She had been having them "since her great uncle passed away." Plaintiff felt "somewhat responsible because she had a hypoglycemic seizure in front of him a month prior to his passing." Plaintiff worried, felt sad, felt angry, and felt depressed. She had no plans to hurt others. She engaged in self mutilation. Plaintiff reported she had no "trouble" in school and had reading and math skills at grade level (R. 400, 404). Plaintiff followed normal sleeping habits. She had no chronic "problems" (R. 403). Plaintiff was instructed to return in three (3) months (R. 406).

A Psychosocial History and Intake Information form was completed on Plaintiff on October 16, 2009, by Kerri Ours, at Elkins Family Counseling Center. Plaintiff was referred by Dr. Chua for severe depression and suicidal thoughts and ideations. Plaintiff reported her relationship with her mother and stepfather were "'somewhat good.'" She attended high school, where she was enrolled in regular and special education classes. Plaintiff fell asleep in her classes. She had volunteered at a

child care center three (3) years earlier; she had not worked. Plaintiff reported she received a "disability benefits check" (R. 628).

Plaintiff presented to the emergency department at Davis Memorial Hospital on December 3, 2009, with suicidal thoughts. Plaintiff had told her therapist, Alicia Arbogast, that she had "taken a butcher knife from the kitchen during the week and laid it to her wrist in a thought to kill herself." Plaintiff stated she could not control her suicidal thoughts. Plaintiff's blood sugar was four-hundred (400) but was at one-hundred, three (103) by "lunch the following day." Her sodium level was low. The remaining examination was normal. Plaintiff smiled, answered questions, and was pleasant. It was noted Plaintiff "skip[ed] breakfast and usually fixe[d] her lunch and [ate] out occasionally." Dr. Chua diagnosed major depressive disorder. She was admitted overnight. Plaintiff was transferred to United Hospital Center on December 4, 2009, for inpatient treatment (R. 366-78).

Plaintiff was admitted to United Hospital Center by Dr. Salman on December 4, 2009, for major depressive disorder (R. 182). Plaintiff informed Dr. Chumber that she was depressed and had suicidal ideations. Plaintiff reported she had felt depressed "for a long time." Plaintiff stated she had taken a butcher's knife from the kitchen and was going to cut her wrist, but someone entered the room and she did not go forward with the action. Plaintiff stated she could not control her suicidal thoughts. Plaintiff reported she was "stressed out" because her twin sister was pregnant "with a child from her sex offender boyfriend." Plaintiff stated she had poor sleep; poor appetite; feelings of worthlessness, hopelessness, and helplessness; mood swings with irritability; and periods of too much energy. Plaintiff stated she occasionally experienced an auditory hallucination; she heard people calling her name. She sometimes saw "shadows of people." She had no paranoia. Plaintiff was "seeing" Alicia Arbogast, a psychologist, on a weekly basis (R. 194). Upon examination, Dr. Chumber found Plaintiff

was fairly groomed and casually dressed; she was smiling; she had psychomotor retardation; she maintained intermittent eye contact; she had no involuntary movements; her speech was at a low rate, volume, and tone; her mood was described as depressed; her affect was constricted; her thought process was logical and she was goal directed; her thought content was negative for paranoid delusions or obsessions; her insight and judgment were fair. Her physical examination was normal (R. 195). Dr. Chumber diagnosed major depressive disorder, recurrent, severe, and with psychotic features; diabetes; hyperlipidemia; chronic mental illness; and a GAF of thirty (30) (R. 196).

Dr. Kotha examined Plaintiff relative to her diabetes while she was a patient at United Hospital Center. Dr. Kotha noted Plaintiff had been admitted to the intensive care unit of Davis Memorial Hospital because her blood sugar was over four-hundred (400). Plaintiff informed Dr. Kotha that she had had suicidal ideations for the past five (5) years due to her cousin dying from cancer. She had tried to kill herself by cutting her wrist with a knife but did not go through with the act because someone entered the room. She presently had no suicidal ideations. She was not, however, "able to control her suicidal thoughts" (R. 203). Dr. Haq prescribed an insulin regimen, advised Plaintiff to adhere to the American Diabetic Association diet, and ordered laboratory tests (R. 204).

While hospitalized, Plaintiff's dosage of psychotropic medications was adjusted; she attended individual and group therapy sessions; she was maintained on Risperdal with good effect; and she was given a trial of Cymbalta. Plaintiff was discharged on December 14, 2009, once her "conditions improved." She was stable. She was instructed to receive outpatient services and medication from "Family Medicine" (R. 182).

Plaintiff was examined by Dr. Chua on January 19, 2010, for diabetes. She was positive for polydipsia, weight change, and hyperlipidemia. Plaintiff reported she was "having command

4

hallucinations to hurt herself or someone else." Her blood sugar had been "running high" (R. 410). Plaintiff medicated with Glucagon, Crestor, Enalapril Maleate, Cymbalta, Citalopram Hydrobromide, Depo-Provera, Lantus, Trazodone, and Abilify. Plaintiff was in no distress; she was oriented; her mood and affect were normal. Dr. Chua then noted Plaintiff's affect was flat. Her examination was normal. Plaintiff was instructed to diet and exercise (R. 411). Dr. Chua discussed Plaintiff's being hospitalized for the command hallucinations; Plaintiff agreed to be admitted (R. 412).

Plaintiff was admitted to United Hospital Center by Dr. Salman on January 19, 2010, for major depression with psychotic features (R. 184). Plaintiff heard "voices to hurt people." She stated her medication was "not working." Plaintiff reported insomnia, poor appetite, feelings of helplessness and hopelessness, and mood swings. She denied suicidal or homicidal thoughts (R. 188). Her physical examination, which was conducted by Dr. Angotti, was normal. Plaintiff was alert and oriented, times four (4). She had excellent eye contact. Her mood was depressed. Her speech was within normal limits. Dr. Salman diagnosed major depressive disorder, recurrent, severe with psychotic features; diabetes; hyperlipidemia; chronic mental illness; and GAF of thirty (30) (R. 189). Plaintiff participated in supportive therapy. Once her psychotropic medication dosage was adjusted, she "did fairly well." Plaintiff "responded well" to Cymbalta. On January 28, 2010, when she was no longer having suicidal thoughts, she was discharged. She was stable. She medicated with Celexa, Buspar, Desyrel, Vasotec, Abilify, aspirin, Cymbalta, and insulin (R. 184).

Plaintiff presented to the emergency department of Davis Memorial Hospital on February 15, 2010, with complaints of suicidal ideations. She reported she had considered taking an overdose of drugs. Her blood glucose was two-hundred, sixty-eight (268). She was transferred to United Hospital Center (R. 266-82).

On February 15, 2010, Plaintiff was admitted to United Hospital Center by Dr. Salman for "suicide with overdose" (R. 186). Plaintiff stated she "tried to kill [herself] because" she could not "live with what" her boyfriend "did to" her. Plaintiff stated that, one (1) month earlier, her boyfriend "got her drunk and had sex with her." She has had "a lot of difficulty with that." She dreamed her boyfriend "caught on fire and she did not care." She sensed her boyfriend's "presence close to her for the last 2 weeks" and she heard him threaten her (R. 191). She was placed on "safety precautions." Her medication was adjusted. Plaintiff was examined by Nurse Practitioner ("N.P.") McPherson. Her physical examination was normal. She was alert and oriented, times four (4). She had no thoughts of suicide or homicide; she had excellent eye contact; her speech was normal; her insight and judgment were poor. N.P. McPherson diagnosed depression with psychotic features, diabetes, hypertension, chronic depression, and GAF of forty (40) (R. 192).

Allan L. LaVoie, Ph.D., a licensed psychologist at Elkins Family Counseling Center, completed a Clinical Evaluation of Plaintiff on April 29, 2010. Plaintiff was referred to Dr. LaVoie by her therapist, "who was concerned about the slow progress in therapy[] and the frequent depressive crises." Dr. LaVoie found Plaintiff was cooperative and oriented, times three (3). Her affect was blunted; her mood was sad. Plaintiff stated she experienced "systematic hallucinations of a female who talk[d] to her and [gave] her advice. These appearances seem[ed] real to her." Plaintiff heard other voices. To make "them stop[,] she scratche[d] her hand hard, non-stop . . . ." Plaintiff's attention and concentration were normal. Her speech was "concrete" and she was "soft spoken." Plaintiff's insight was poor. She denied current suicidal ideations. Plaintiff reported disturbed sleep; she had not slept since April 24, 2010, because "thoughts of suicide" kept her awake. When Plaintiff last slept, five (5) days earlier, it was a "consequence of a seizure." Plaintiff's appetite was poor. Plaintiff weighed two-

hundred, seventeen (217) pounds, which was her "regular" weight. Plaintiff "twitched and tremored" during the interview. Plaintiff stated she had been "raped by an ex-boyfriend" after she had smoked marijuana and drunk vodka. That incident led to "the current depressive" state (R. 629). Dr. LaVoie noted that, during Plaintiff's eight (8) months of treatment at Elkins Family Counseling Center, she had stated she had been suicidal for five (5) years, "dating from the time her cousin died of colon cancer at age 24. This is one of many inconsistencies in her reports." Plaintiff's suicidal thoughts included overdosing, jumping off a roof, and shooting herself. Plaintiff worried she "may hurt the people" whom she loved (R. 630).

Plaintiff attended church with her current boyfriend. She lived with her mother and stepfather. She was a senior in high school, attending special education classes, but, "after the depressive episodes[,] she switched to Home Bound instruction." Plaintiff did not plan to seek employment after graduation because she could not "function well in public"; she had applied for Social Security benefits (R. 630).

Plaintiff's responses on the Adult Behavior Checklist ("ABC") produced the following results: 99th percentile for Ad/H problems, antisocial personality problems, avoidant personality problems, and depressive problems. Plaintiff's total problems score was one-hundred, thirty-two (132). On the Center for Epidemiologic Studies-Depression, Revised ("CES-D-R"), test, Plaintiff scored as follows: raw score of thirty-four (34) on March 8, 2010, which was in the range of severe depression and which was significantly higher from the January 28, 2010, score of ten (10), which was a normal range. Plaintiff's scores on the October 17, November 19, December 17, and December 23, 2009, questionnaires were in the range of severe to very severe depression. Plaintiff's score on the April 27, 2010, Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") was invalid. Plaintiff was not "at

all defensive" in her responses to the April 27, 2010, Substance Abuse Subtle Screening Inventory-3 ("SASSI3") questionnaire, which led Dr. LaVoie to opine there was "some question about whether she was exaggerating her use and symptoms." Plaintiff's score, on the April 27, 2010, Weschler Abbreviated Scale of Intelligence ("WASI") assessment, was full scale IQ - 62, which put her in the "range of mild mental retardation" (R. 631). Plaintiff's scores on the April 27, 2010, Wide Range Achievement Test-Revised ("WRAT-4") were as follows: reading - 77 (6th percentile); sentence comprehension - 81 (10th percentile); math - 83 (13th percentile); and reading composite - 77 (6th percentile) (R. 631-32).

Dr. LaVoie diagnosed the following: Axis I - major depressive disorder, recurrent, severe with psychotic features, and "rule out" schizoaffective disorder, posttraumatic stress disorder, and malingering; Axis II - mild mental retardation, personality disorder, NOS, with avoidant and borderline features; Axis III - diabetes, seizure disorder; Axis IV - "problems with primary support group," such as inconsistent contact with biological father, some discord with her sisters and brothers, feelings of isolation, death of cousin, and rumor that grandmother killed her grandfather; and AXIS V - GAF of forty-three (43). As to his diagnosis of mild mental retardation, Dr. LaVoie opined that he "believed this may be an under-estimate. She seemed to make a good effort, but her presentation appeared to suggest a higher level of ability." He believed her "true ability [was] in the borderline range" and was the "reason her mild MR diagnosis [was] made provisionally." Dr. LaVoie further opined that he had "doubts about [Plaintiff's] inconsistent reports about the hallucinations, about her claim to having been sleepless for several days in a row, about having a seizure disorder, and about other features of her functioning. Adding to [his] doubts was her report that she was to present next week for an SSI evaluation. Her twin sister had been receiving disability payments for many years, and [Plaintiff] had

recently applied. Others in the family reportedly encouraged her to do this." Dr. LaVoie did not, however, "have reservations about [Plaintiff's] depressive symptoms." Her behavior was congruent with her own reports. Dr. LaVoie found Plaintiff needed "additional support services," along with her medication, to "maintain[]" (R. 633). Plaintiff's risk for self harm was high. Dr. LaVoie recommended therapy that included her fiancé (R. 634).

Thomas C. Stein, Ed.D., completed an Adult Mental Profile of Plaintiff for the West Virginia Disability Determination Service on May 3, 2010. Plaintiff was casually dressed; her mother drove her to the evaluation. Plaintiff reported she was angered easily, she hurt herself by burning and cutting herself, she was not patient with others, she stayed to herself, she did "stuff" when she was angry but could not remember doing it afterwards, she punched or kicked others who had hurt her in the past, she had diabetes, and she had seizures (R. 245-46). Plaintiff stated she had given her ex-boyfriend two (2) black eyes and she had thrown her stepfather out a window. Plaintiff reported she lived with her thirty-five (35) year old mother, thirty-eight (38) year old stepfather, and half siblings, aged three (3), six (6), sixteen (16), and seventeen (17). Plaintiff had no income (R. 246).

Plaintiff's symptoms were sleep disturbances, crying episodes, anger and bad mood, recent suicidal ideations, panic attacks, and compulsive cleaning patterns and checking behaviors. Plaintiff reported she had attempted suicide twice when she was eighteen, once by attempting to cut her wrist and by attempting to take an overdose of pills. Plaintiff reported she had been "raped as a teenager" and had witnessed parental domestic violence. She did not trust "any man" (R. 246).

Plaintiff reported she and her ex-boyfriend had consumed four bottles of vodka once when she was eighteen (18) years old, and she had had "two puffs of marijuana this year." Plaintiff reported she had been hospitalized twice for depression and suicidal attempts and once for medication stabilization

when she was eighteen (18) years old. She received outpatient mental health treatment once weekly. Plaintiff was in the twelfth grade of school. She was "homebound" and attended school two (2) nights per week (246). Plaintiff reported the teachers told her she "couldn't do public school because of [her] emotional problems and things that have happened" to her (R. 246-47). Prior to homebound instruction, Plaintiff attended special education classes at school; she had not repeated any grades; she had had no suspensions; she was involved in Students Against Drunk Driving. Her grades were Cs and Ds (R. 247).

Upon examination, Dr. Stein found Plaintiff's posture and gait were normal; she was five feet, five inches (5'5") tall and weighed two-hundred fourteen (214) pounds. She was cooperative, polite, and subdued during the examination. She maintained fair eye contact; her responses were not spontaneous; she displayed no sense of humor; she was introverted with fair conversation skills. Plaintiff's speech was relevant but brief; she had a mild disarticulation; she spoke at a slow pace. Plaintiff was oriented as to time, place, person, and date. Her mood was depressed and her affect was subdued. She displayed mild paranoid delusional thinking; she described occasional "auditory command type" hallucinations to hurt herself. Plaintiff's insight was fair; her judgment was poor; her immediate memory was mildly deficient; her recent memory was normal; her remote memory was mildly deficient; her concentration was poor; and she demonstrated "[l]ots of psychomotor agitations." She was at moderate risk of suicide, based on her "two or three recent attempts." She was a mild risk "for assault or aggressiveness towards others" (R. 247).

Plaintiff scored as follows on the Wechsler Adult Intelligence Scales - Third Edition ("WAIS-III"): Verbal IQ - 74; Performance IQ - 64; Full Scale IQ - 67; Verbal Comprehension Index - 76; Perceptual Organization Index - 67; Verbal Subtests - Mean 5.7; and Performance Subtests - Mean 4.2.

Dr. Stein found Plaintiff's reading level was at the fifth grade. Her Full Scale IQ score "suggest[ed]" mild mental retardation"; however, Dr. Stein found that "a more accurate interpretation of this is that she functions within the borderline range of intelligence" (R. 247-48).

Plaintiff scored as follows on the Wide Range Achievement Test - Third Version ("WRAT-3"): reading - 78 (fifth grade); spelling - 61 (second grade); arithmetic - 59 (third grade) (R. 248).

Dr. Stein made the following diagnoses: Axis I - rule out schizoaffective disorder; intermittent explosive disorder; posttraumatic stress disorder, chronic and mild symptoms; and learning disability, no otherwise specified; Axis II - borderline personality disorder and borderline intellectual functioning; Axis III - diabetes and hypercholesterolemia. Her prognosis was fair (R. 249).

Plaintiff's daily activities were as follows: rose at 7:30 a.m.; cared independently for personal hygiene; prepared and ate breakfast; walked sister to the school bus; chatted with her stepfather, who was unemployed, and with her mother, who was a homemaker; rode in the car with her mother "if mom [was] doing errands"; ate lunch, which her mother prepared; worked on the computer; checked her Facebook page; talked with her boyfriend on the phone; went with her mother any time her mother went anywhere; finished homework; attended classes from 4 p.m. to 7 p.m. (her mother drove her and collected her); talked to her boyfriend, who visited her at her home; worked on the computer more; and then retired to bed at 11:30 p.m. She occasionally cleaned, did not cook, rarely washed dishes, occasionally did laundry, rarely gardened or helped "with firewood," occasionally grocery shopped with her mother, walked, sat on the porch, rarely read, rarely fished, and had no hobbies (R. 247, 249). As to Plaintiff's social functioning, Dr. Stein noted Plaintiff occasionally attended church, dated regularly, had a boyfriend, regularly visited friends and relatives, and occasionally socialized with friends and neighbors. Plaintiff rarely ate at restaurants and had no memberships in clubs. She was

mildly deficient in her social interaction with him. Dr. Stein found Plaintiff's concentration was moderately deficient; her persistence was mildly deficient; and her pace was moderately slow. She could manage her own financial affairs (R. 250).

On August 30, 2010, Plaintiff informed Dr. Chua that she had "start[ed] to hear voices and [had] suicidal ideations again." Plaintiff stated she had not been taking Trazodone or Abilify. She was positive for hypoglycemic episodes, hypertension, and hyperlipidemia; her examination was normal (R. 435). Plaintiff medicated with Crestor, Enalapril, Glucagon, Novolog, Cymbalta, Depo-Provera, and Lantus. Dr. Chua found Plaintiff was in no distress; she was oriented; her mood and affect were normal (R. 436). Plaintiff was instructed to diet, exercise, and return in one (1) month (R. 437).

Kerri Ours, B.A., Plaintiff's Clinical Case Manager at Elkins Family Counseling Center, completed a Mental Health Assessment by a Non-Physician of Plaintiff on September 2, 2010. Plaintiff stated she wanted to "'try to get rid of the thoughts'" she was having. She stated she could not stop thinking about killing people; she had a history of suicidal thoughts. Plaintiff made little eye contact, was cooperative, answered questions, did not elaborate, and was soft spoken (R. 635).

Plaintiff lived with her mother and stepfather. She had no contact with her biological father. She had a twin sister, who was married and who had a two (2) month old baby (R. 635). Plaintiff completed high school on the "Home Bound" program in 2010. Plaintiff stated that, while she attended school, she was in "all special education classes." Plaintiff did "horribly" when she was placed in regular classes; she fell asleep. She had no employment history. She received disability benefits. Plaintiff stated swimming was an activity she enjoyed. Plaintiff stated she had used marijuana, cocaine, and excess alcohol in the past. Plaintiff only drank alcohol on occasion "to help with her kidneys." Plaintiff stated her suicidal thoughts began six (6) years earlier when a cousin died.

Plaintiff stated she had been sexually assaulted in 2009. Plaintiff reported seizure disorder, which caused memory loss and which had increased in frequency "lately." Plaintiff stated she had diabetes, which caused kidney "problems." Plaintiff stated she was positive for hypertension, hyperlipidemia, and back "problems." Plaintiff medicated with Seroquel, Cymbalta, Enalapril, and Crestor (R. 636).

Ms. Ours diagnosed major depressive disorder, recurrent and severe with psychotic features; schizoaffective disorder; posttraumatic stress disorder; and malingering. Ms. Ours found Plaintiff's GAF was fifty (50). Ms. Ours recommended Plaintiff participate in individual therapy (R. 638).

Plaintiff was admitted to Davis Memorial Hospital on September 11, 2010, with syncopal type symptoms. Plaintiff's fiancé reported Plaintiff would "sort of stare off and not be responding to him." She "seemed like she 'blacked out.'" Her hands shook when she was conscious. She did not lose bowel or bladder control. She did not fall off the chair on which she was sitting. Dr. Chua noted Plaintiff medicated with Lantus, Seroquel, Novolog insulin, Enalapril, Crestor, and birth control pills. Dr. Chua noted that it was difficult to interview Plaintiff about her symptoms because she was "a little bit not wanting" or "unable" to answer questions. She was not "clear." Her physical examination was normal. Dr. Chua opined her symptoms were "more likely" to be associated with her psychiatric "problems" than a "new onset of seizure disorder" (R. 308). Her blood sugar was three-hundred, twenty-nine (329) (R. 316).

Alisha G. Arbogast, M.S., a licensed psychologist at Elkins Family Counseling Center, completed a Mental Health Assessment by Non-Physician of Plaintiff on January 6, 2011. Ms. Arbogast noted Plaintiff had enrolled in counseling in September, 2010, "due to continued anger and depression, including thoughts of harming herself and others." Ms. Arbogast noted that, on September 2, 2010, Plaintiff reported she was angry and had irrational thoughts "particularly in relation to her

13

boyfriend['s] . . . ex-girlfriend and daughter." Plaintiff agreed to keep a journal in an effort to work on anger management. By mid-September, 2010, Plaintiff had reduced feelings of anger. Plaintiff reported she had moved into her own apartment in October, 2010. Plaintiff reported having made poor choices as to her physical health (R. 639). Plaintiff had been scheduled for weekly therapy sessions since September 2, 2010. She had attended eight (8). She had missed nine (9). She did not cancel her appointments. When she was contacted about her having missed appointments, Plaintiff "provide[d] inconsistent reasons for her absences" (R. 641).

Upon evaluation, Ms. Arbogast found Plaintiff was dressed and groomed appropriately; her posture was tense; her eye contact was fair. She was alert; her movements and behaviors were within normal limits. Her speech was soft and slow. Plaintiff was cooperative. Her affect was appropriate and her mood was anxious and cheerful. Ms. Arbogast noted "mild underlying depression." Plaintiff's thought processes were logical and goal directed; her thought content "contained themes of somatic complaints." Plaintiff denied suicidal or homicidal ideations. Ms. Arbogast found Plaintiff's attention and concentration were mildly impaired. She was negative for hallucinations, delusions, or dissociative episodes. Her insight and judgment were fair. Mr. Arbogast reviewed the September 2, 2010, CES-D-R report (R. 640).

Ms. Arbogast found it "difficult[]" to understand Plaintiff's medical issues because she tended "to provide confusing and contradictory reports" (R. 640). Ms. Arbogast listed Plaintiff's medications as Seroquel, Cymbalta, Enalapril, and Crestor. Ms. Arbogast listed the following "high risk factors": limited intelligence, severity of her diagnoses, lack of social support, suicidal thoughts, impulsivity, poorly controlled anger, sexual abuse, limited finances, hypochondrial tendencies, and previous placements in inpatient services. Ms. Arbogast diagnosed the following: major depressive disorder,

recurrent and severe with psychotic features, schizoaffective disorder, posttraumatic stress disorder, and malingering, borderline intellectual functioning (provisional), personality disorder with avoidant and borderline features, diabetes, seizure disorder, high cholesterol, and possible thyroid conditions. Ms. Arbogast found Plaintiff's "problems with primary support group" included lack of contact with biological father, discord with siblings, death of cousin, and conflict between her mother and her boyfriend. She had no friends, other than her sister and her boyfriend. She was unemployed. She had conflict with her neighbor. She had no license to drive a car. Her current GAF was fifty-three (53). Plaintiff reported improvement in her depression and anger. Her long-term prognosis was guarded (R. 641). Mr. Arbogast noted Plaintiff "continue[d] to struggle to maintain her ability to function as an adult." Ms. Arbogast found Plaintiff would benefit from "linking to employment opportunities"; "locating and enrolling in a training program"; assistance in preparation of meals and managing money; "involvement in activities and organizations to increase her support group"; and "assistance in learning about nutritional needs and developing a menu of appropriate meal options." Ms. Arbogast found Plaintiff should continue to participate in individual therapy (R. 642).

On April 11, 2011, Joseph A. Shaver, Ph.D., found the "[c]urrent [p]sych MER does not adequately address such key areas as memory, concentration, pace, persistence of social functioning. We need a more fomal (sic) MSE on the Clmt" (R. 458).

Dr. Stein completed a Mental Status Examination of Plaintiff on May 2, 2011. Plaintiff drove to the examination; she appeared to be anxious, cooperative, and of below average intelligence. Plaintiff stated she had been depressed and had suicidal thoughts. She reported she had diabetes and experienced "seizures and epilepsy." She stated she was a slow learner and had difficulty reading and remembering to do things such as dressing and wearing glasses (R. 459, 461). Plaintiff's mother

reported Plaintiff lived "on her own," but Plaintiff's boyfriend drove Plaintiff to her mother's house each morning and picked her up each evening. Plaintiff reported sleep and eating disturbances, crying episodes, poor energy, depressed mood, and panic attacks. Plaintiff denied previous suicide attempts; Dr. Stein found she was at mild risk for suicidal thoughts. She denied any physical traumas, emotional traumas, or PTSD symptoms. Dr. Stein noted Plaintiff had been hospitalized three (3) times for severe depression and suicidal ideations. Plaintiff was being treated for depression, suicidal thoughts, elevated cholesterol, acute sunburn, diabetes, and GERD. Plaintiff medicated with Cymbalta, Naproxen, Hydroxyzine HCl, Cefazolin, Abilify, Phenergan, Crestor, Enalapril, Clonazepam, Nexium, Novolog, and birth control pills. Plaintiff was receiving out-patient mental health treatment. Plaintiff reported she graduated high school in 2010, had no expulsions, received Bs and Cs as grades, and was in special education classes (R. 460). Plaintiff had no work history (R. 461).

Upon examination, Dr. Stein found Plaintiff maintained poor eye contact and her verbal responses were brief. She displayed no sense of humor. She generated no spontaneous conversation. She was introverted. Her speech was relevant, coherent, and normal paced. She was oriented to time, place, person, and date. Her mood was depressed and her affect was anxious and agitated "with nonstop hand wringing." There were no thought process disturbances noted. Plaintiff's thought content was normal. Plaintiff stated her perceptual disturbance was she saw "people who have already died" about once per week. Her insight and judgment were poor. She had no suicidal plans or current ideations. Plaintiff's immediate memory was mildly deficient; her recent memory was moderately deficient; her remote memory was moderately deficient. Plaintiff's concentration was poor (R. 461).

Plaintiff described the following activities of daily living: rose at 6:00 a.m., cared for her personal hygiene, fixed and ate breakfast, cleaned the kitchen, checked her email, dressed, rode with

her boyfriend to her mother's house, visited her mother and attempted to "help her mother out," ate lunch, ate dinner, returned home with her boyfriend, visited with boyfriend, retired at 10:30 p.m. Plaintiff needed reminded to complete her hygiene. She washed clothes, occasionally grocery shopped with help, and occasionally walked and sat on the porch. Plaintiff rarely read, had no hobbies, did not garden, did not run errands and she did not drive. Plaintiff did not attend church and belonged to no clubs or organizations. She occasionally dined at restaurants; she regularly visited relatives; she occasionally socialized with friends or neighbors (R. 462).

Dr. Stein diagnosed as follows: Axis I - major depression, recurrent with psychotic features and learning disability, not otherwise specified; Axis II - borderline intellectual functioning (by history); Axis III - diabetes, hypertension, hypercholesterolemia, GERD, and severe sunburn. Her prognosis was poor (R. 462). Dr. Stein found Plaintiff was moderately deficient in social functioning during the examination (R. 462). Dr. Stein found Plaintiff's concentration was moderately deficient; her persistence was mildly deficient; her pace was moderately slow (r. 462-63). Dr. Stein found Plaintiff would require a "fiscal agent to assist her in handling her financial affairs because of her cognitive deficits" (R. 463).

Dr. Shaver completed a Psychiatric Review technique of Plaintiff on May 12, 2011 (R. 464). Dr. Shaver found Plaintiff's organic mental disorder was borderline intellectual functioning and learning disability, not otherwise specified (R. 465). Plaintiff's affective disorder was major depressive disorder, recurrent, with psychotic features (R. 467). Dr. Shaver found Plaintiff had mild restrictions to her activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties maintaining concentration, persistence, or pace. Plaintiff had not experienced

any episodes of decompensation (R. 474). In making his assessment, Dr. Shaver relied on medical records from October, 2009, and Dr. Stein's May 2, 2011, Mental Status Examination (R. 476).

Also on May 12, 2011, Dr. Shaver completed a Mental Residual Functional Capacity Assessment of Plaintiff. In the Understanding and Memory category, Dr. Shaver found Plaintiff was not significantly limited in her ability to remember locations and work-like procedures or understand and remember very short and simple instructions; she was moderately limited in her ability to understand and remember detailed instructions (R. 478). In the Sustained Concentration and Persistence category, Dr. Shaver found Plaintiff was not significantly limited in her abilities to carry out very short and simple instructions, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by then, and make simple work-related decisions; she was moderately limited in her abilities to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, complete a normal workday or workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods (R. 478-79). In the Social Interaction category, Dr. Shaver found Plaintiff was not significantly limited in her abilities to interact appropriately with the general public, ask simple questions or request assistance, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness; she was moderately limited in her abilities to accept instructions and respond appropriately to criticism from supervisors and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Dr. Shaver found Plaintiff was not significantly limited in any of the abilities in the Adaption category (R. 479). Dr. Shaver relied on Dr. Stein's May 2, 2011, Mental Status Examination (R. 480, 482).

On June 18, 2011, Jeff Harlow, Ph.D., reviewed Dr. Shaver's May 12, 2011, Mental Residual Functional Capacity Assessment and Psychiatric Review and affirmed same (R. 483).

Patricia K. Haddix, M.A., LPC, of Elkins Family Counseling Center, completed a Clinical Update of Plaintiff on September 14, 2011, which encompassed the time period of January 6, 2011, to the date of the report. Since Plaintiff's last clinical update, she reported "having a lot of trouble controlling her diabetes." She had seizures and increased panic attacks. Plaintiff stated she kept a food diary to track her food intake for diabetes. Plaintiff reported that, on July 4, 2011, a family friend committed suicide while speaking on the phone with Plaintiff's mother; Plaintiff was at her mother's home when this occurred. Plaintiff had been awarded HUD benefits to obtain housing, but she lost that in August, 2011, when it was discovered that her boyfriend was living at the residence. Plaintiff reported the following changes to her medication: she began taking seizure medication in February, 2011; her antidepressant was changed in March, 2011; she did not take Abilify in May and June, 2011; when she resumed taking Abilify, the dosage was reduced from 20mg to 10mg; and she had not taken her medications in three (3) months "due to having possible side effects from sun exposure." Plaintiff stated she had an increase in symptoms; she denied a correlation between the increase in her symptoms and her "not taking her medication" (R. 644). Ms. Haddix noted Plaintiff had retained a lawyer to assist her with receiving disability benefits; her earlier application had been denied (R. 645).

Ms. Haddix noted Plaintiff's January 13, 2011, ABC was "completed by boyfriend." The scores were in the normal range. Plaintiff scored as follows on the January 13, 2011, ASR: total problems and internalizing scores were in the clinical range; externalizing score was borderline clinical range; and depressive problems, avoidant personality problems, and AD/H problems were in the clinical range. Plaintiff attained a raw score of nineteen (19) on the January 13, 2011, CES-D-R,

which showed major depression. Plaintiff's August 18, 2011, mental status examination showed the following: odd appearance in that she was wearing sweat pants and a heavy shirt in warm weather; grooming was neglected; slumped posture; fair eye contact; alert and oriented in all spheres; slow/retarded movements; slow speech; cooperative attitude; appropriate affect; anxious and depressed mood; somatic complaints and passive suicidal thoughts; tangential thought processes; mildly impaired attention; no hallucinations; frequent seizures; and fair-to-poor insight and judgment (R. 645).

Ms. Haddix found Plaintiff's high risk factors included limited intelligence, severity of diagnoses, lack of social support, suicidal and self-harming thoughts, impulsivity, poorly controlled anger, sexual abuse, limited finances, hypochondrial tendencies, inpatient treatment, not taking psychotropic medications as prescribed, and having been recently evicted from her apartment. Ms. Haddix diagnosed major depressive disorder, recurrent and severe with psychotic features; schizoaffective disorder; posttraumatic stress disorder; malingering; borderline intellectual functioning (provisional); personality disorder, NOS with avoidant and borderline features; diabetes; seizure disorder; and high cholesterol (R. 646). Ms. Haddix noted Plaintiff's attendance at weekly individual therapy sessions was fair. Plaintiff's response to treatment had been slow. Plaintiff was "unable to see the connection between her increase of symptoms and her not taking her medication." Her prognosis was guarded. She was at moderate to high rise for relapse, especially because she was not taking her medication as prescribed (R. 647). Ms. Haddix recommended Plaintiff continue individual therapy and work toward goals of improving her anger (R. 648). Ms. Haddix also recommended the following: Plaintiff contact the West Virginia Department of Rehabilitation for assistance in obtaining employment and training and involvement in activities and organizations that increased her support

group. Ms. Haddix found Plaintiff did not need assistance in homemaking, self-care, or independent living (R. 647-48).

Ms. Arbogast wrote a letter, addressed "To Whom It May Concern," dated May 23, 2012. In that letter, Ms. Arbogast wrote Plaintiff had attended twenty-seven (27) weekly therapy sessions since September 14, 2011; she had missed five (5). She had been scheduled for two (2) sessions per month, starting in April, 2012, due to Plaintiff's having reported to her therapist that she had decreased depression and anger. Ms. Arbogast noted Plaintiff "continue[d] to provide confusing and contradictory information," which was "perceived to be related to her limited intelligence and her tendency to rely on the opinions and thoughts of others in the absence of recognition and understanding of her own thoughts" (R. 649).

## Administrative Hearing

Upon questioning by her lawyer, Plaintiff stated she required "extra help" in her math, reading, and English classes in school (R. 38). Plaintiff had difficulty handling money because she did not "know the right amount to give someone." Plaintiff had difficulty managing her food stamps because she would purchase more food than she had food stamps with which to pay. Plaintiff testified her medication "help[ed] a little, but not a whole lot , like it should (R. 39).

Plaintiff described her symptoms as follows: she was irritable and wanted to "punch walls"; she did not sleep "much"; she became "overexcited," which caused elevated depression and she had anxiety attacks (R. 40). Plaintiff testified she visited her mother, who helped her shower and take medication. Plaintiff stated she was living with her sister (R. 41). She could not live on her own because if her "depression gets worse, [she] could end up killing" herself (R. 47). Plaintiff testified she was having suicidal thoughts during the administrative hearing (R. 47)

Plaintiff tested her blood sugar eight (8) times per day. Plaintiff stated her blood sugar levels were between three-hundred (300) and five-hundred (500). Plaintiff testified she did not understand how to follow a diabetic diet (R. 42). Plaintiff testified she had not taken any medication the day of the administrative hearing (R. 43). When Plaintiff grocery shopped, she bought "mostly junk food." Plaintiff understood she was not suppose to eat junk food because of her diabetes, but she bought it because it "was easier to calculate." Plaintiff did not keep a log of her blood sugar levels. Plaintiff had gained weight; she walked, for exercise, twice per week (R. 44). Plaintiff testified when she medicated with "the other type of medication" for diabetes and not "the pump," her blood sugar was better controlled (R. 46).

Plaintiff testified she did not socialize with others (R. 45). Plaintiff stated she did not seek medical care for her seizures; her sister "poured orange juice down" her "throat." She took no medication for seizures because she had not "talked with [her] doctor about it." Plaintiff stated when she took seizure medication, it helped her symptoms.

The ALJ asked the VE the following hypothetical question"

. . . [A]ssume a hypothetical individual of the Claimant's age, educational background and lack of work history, who would be able to perform a range of light work. Would be able to perform postural movements occasionally, except could not climb ladders, ropes or scaffolds. Should not be exposed to temperature extremes, wet or humid conditions or hazards. . . . Should work in a low-stress environment with no production line or assembly line type of pace, no independent decision-making responsibilities and minimal changes in the daily work routine. Would be limited to unskilled work involving only routine and repetitive instructions and tasks, with no reading beyond the fifth grade level and no math beyond the third grade level. Should have no interaction with the general public and minimal, no more than occasional interaction with co-workers and supervisors. . . . Would there be any work in the regional or national economy that such a person could perform? (R. 50).

The VE testified that such a hypothetical person could perform the work of collator operator, 55,000 national jobs and 115 regional jobs; folding machine operator, 73,000 national jobs and 350 regional jobs; and inserting machine operator, 82,000 national jobs and 1,025 regional jobs (R. 50).

### III.  ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 416.920 (1997), ALJ Alexander made the following findings:

1.  The claimant has not engaged in substantial gainful activity since January 20, 2011, the application date (20 CFR 416.971 *et seq.*).

2.  The claimant has the following severe impairments: seizure disorder; insulin dependent diabetes mellitus; major depressive disorder with psychotic features; schizophrenic disorder; mild post traumatic stress disorder; borderline personality disorder with avoidant features not otherwise specified; history of intermittent explosive disorder; learning disorder not otherwise specified; and borderline intellectual functioning with a rule out diagnosis of malingering. (20 CFR 416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(c), 416.925 and 416.926) (R. 13).

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant is precluded from climbing ladder (sic), ropes, and scaffolds, but is otherwise limited to no more than occasional postural activities; the claimant should have no exposure to unprotected heights, dangerous moving machinery, or other workplace hazards; the claimant should have no exposure to extremes of temperature, wetness, or humidity; the claimant is limited to low stress work environment with no production line or assembly line pace, no independent decision making, and no more than minimal changes in the daily work routine; the claimant is limited to unskilled, routine, and repetitive instructions and tasks requiring no more than a fifth grade reading level and no more than third grade mathematic skills; the claimant should have no more than occasional interaction with supervisors and coworkers and no interaction with members of the general public (R. 16).

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on April 23, 1991 and was 19 years old, which is defined as a younger individual, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.968).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)) (R. 20).

10. The claimant has not been under a disability, as defined in the Social Security Act, since January 20, 2011, the date the application was filed (20 CFR 416.920(g)) (R. 21).

## IV. DISCUSSION

**A. Scope of Review**

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990), (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Secretary's decision, the reviewing court must also consider whether the administrative law judge applied the proper standards of law: "A factual

finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

**B.    Contentions of the Parties**

Plaintiff contends:

1.    The ALJ erred in finding that Plaintiff does not meet or equal Listing 12.05(c), inasmuch as she has a valid verbal, performance or full scale IQ of 60 to 70 and physical or other mental impairments which impose additional and significant work-related limitations of functioning.

(Plaintiff's Brief at 8-12.)

The Commissioner contends:

1.    Substantial evidence supports the ALJ's finding that Plaintiff does not meet Listing 12.05C.

(Defendant's Brief at 12-16.)

**C.    Listing 12.05C**

As her only claim for relief, Plaintiff asserts that the "evidence of record clearly and overwhelmingly establishes that [she] meets or equals Social Security Disability Listing 12.05(c) for intellectual disability." (Plaintiff's Brief at 8.) Specifically, Plaintiff argues that the "ALJ erred when he chose to unilaterally invalidate or ignore [her] IQ scores, which clearly meet or equal the criteria of Listing 12.05(c)." (Id. at 9.) Plaintiff further claims that she meets the criteria of Listing 12.05(c) because she is "extremely limited in her adaptive functioning due to her mental health impairments and intellectual disability." (Id. at 11.) Defendant argues that "[c]ontrary to Plaintiff's contention, the record evidence reveals she did not manifest deficits in adaptive functioning prior to age 22 and she did not receive a **valid** verbal, performance, or full scale IQ of 60 through 70." (Defendant's Brief at 1.)

As a general rule, "for a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, not matter how severely, does not qualify." Sullivan v. Zebley, 493 U.S. 521, 530 (1990). The claimant bears the burden of proving that he or she meets all of the requirements of a listing. See 20 C.F.R. §§ 416.912(a), 416.925(c)(3). Specifically, Listing 12.00 provides in pertinent part:

> The structure of the listing for intellectual disability (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for intellectual disability. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic criteria in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing. Paragraphs A and B contain criteria that describe disorders we consider severe enough to prevent your doing any gainful activity without any additional assessment of functional limitations. For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a "severe" impairment(s), as defined in sections 404.1520(c) and 416.920(c). If the additional impairment(s) does not cause limitations that are "severe" as defined in sections 404.1520(c) and 416.920(c), we will not find that the additional impairment(s) imposes "an additional and significant work-related limitation of function," even if you are unable to do your past work because of the unique features of that work. Paragraph D contains the same functional criteria that are required under paragraph B of the other mental disorders listings.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00.

> Listing 12.05C provides:

> *Intellectual disability*: intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

> . . .

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C; see also Hancock v. Astrue, 667 F.3d 470, 473 (4th Cir. 2012) (noting that a claimant must demonstrate that (1) she has deficits in adaptive functioning that began before age 22; (2) she has a valid verbal, performance, or full scale IQ score of 60 through 70; and (3) she has a physical or other mental impairment that imposes an additional and significant work-related limitation of function).

As to Listing 12.05C, the ALJ stated:

> Finally, the "paragraph C" criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. During a psychological consultative examination in May 2010, the claimant completed the Wechsler Adult Intelligence Scale, 3rd edition (WAIS-III), achieving valid verbal, performance and full-scale intelligence quotient (IQ) scores of 74, 64, and 67, respectively. (Exhibit 3F/4). Given her poorly controlled diabetes mellitus (Exhibit 19F/2), the claimant initially appears to meet the requirements of Section 12.05(c). Nevertheless, the consultative examiner opined that, although the claimant's scores suggest mild mental retardation, a "more accurate interpretation" would be that she functions within the range of borderline intellectual functioning. (Exhibit 19F/4). Furthermore, during a psychological evaluation in April 2010, the claimant completed the Wechsler Abbreviated Scale of Intelligence (WASI) again achieving a full score of 62, a score in the 1st percentile and consistent with mild mental retardation. (Exhibit 21F/3-4). In this instance, however, the claimant's performance on the Wide Range Achievement Test, Revised (WRAT-4) produced an average score of 81.25, approximately 20 pounds higher than her estimated ability. (Exhibit 21F/6). Accordingly, the examiner opined that the claimant's IQ scores may represent an underestimate of her ability. (Exhibit 21F/6). This anomaly must be viewed in light of the claimant's history of providing "confusing and contradictory information." (Exhibit 21F/22). Furthermore, the claimant testified that she previously had been living independently, but moved in with her sister because she "couldn't live on my own." The record, however, indicates that the claimant lost her housing subsidy due to a violation of program regulations. (Exhibit 21F/17). Finally, given the claimant's reasonably full range of daily activities as set forth above, I find that she has a higher level of adaptive functioning than is at first suggested by her intelligence quotient scores.

(R. at 15-16.)

### 1.    Additional Impairment

As an initial matter, the Commissioner does not contest that Plaintiff satisfied the requirement in Listing 12.05C regarding an additional physical or mental impairment. At Step Two of the sequential evaluation, the ALJ stated:

> The claimant has the following severe impairments: seizure disorder; insulin dependent diabetes mellitus; major depressive disorder with psychotic features; schizophrenic disorder; mild post traumatic stress disorder; borderline personality disorder with avoidant features not otherwise specified; history of intermittent explosive disorder; learning disorder not otherwise specified; and borderline intellectual functioning with a rule out diagnosis of malingering. (20 CFR 416.920(c)).

(R. at 13.) Furthermore, when discussing Listing 12.05C, the ALJ noted: "Given her poorly controlled diabetes mellitus (Exhibit 19F/2), the claimant initially appears to meet the requirements of Section 12.05(c)." (Id. at 15.) A finding that a claimant suffers from a severe combination of impairments establishes the additional impairment requirement of Listing 12.05C. See Luckey v. U.S. Dep't of Health & Hum. Servs., 890 F.2d 666, 669 (4th Cir. 1989); see also Burkhammer v. Comm'r of Soc. Sec., No. 1:12CV113, 2013 WL 4478105, at *8 (N.D. W. Va. Aug. 19, 2013) (citing Luckey). Accordingly, the ALJ properly found that Plaintiff met this prong of Listing 12.05C.

### 2.    Deficits in Adaptive Functioning

Because intellectual disability is a lifelong condition, a claimant must demonstrate that the condition predates the age of 22. See Luckey, 890 F.2d at 668. The Fourth Circuit has held that, if an ALJ determines that a claimant does not have deficits in adaptive functioning and bases that determination on substantial evidence, the inquiry ends. Hancock, 667 F.3d at 475. Factors used to determined whether deficits in adaptive functioning exist include "limitations in areas such as

communication, self care, home living, social/interpersonal skills, use of community resources, self direction, functional academic skills, work, leisure, health, and safety." <u>Jackson v. Astrue</u>, 467 F. App'x 214, 218 (4th Cir. 2012) (citing <u>Atkins v. Virginia</u>, 536 U.S. 304, 309 n.3 (2002)). Courts in the Fourth Circuit have found that a claimant's illiteracy, failure to graduate from high school, enrollment in special education classes, and poor grades are all important when reviewing whether a claimant has deficits in adaptive functioning in academic skills. <u>See</u> <u>Herron v. Astrue</u>, No. 5:12-CV-44, 2012 WL 4747270, at *10 (N.D. W. Va. Aug. 24, 2012) (collecting cases).

In her motion, Plaintiff asserts that the ALJ erred by finding that she did not demonstrate deficits in adaptive functioning prior to the age of 22. Specifically, Plaintiff argues as follows:

> Ms. Hinkle is extremely limited in her adaptive functioning due to her mental health impairments and intellectual disability. For many years, Ms. Hinkle has lived a sheltered life, heavily dependent upon her family for daily functioning. As cited above in the facts, . . . , Ms. Hinkle spends her days at her mother's home where her mother assists her throughout the day because she cannot live alone (TR 41-42). She is incapable of driving a car out of fear of being by herself, cannot handle her personal finances, and needs reminders to take medications and perform personal hygiene activities (TR 41, 146-147). She reports limited attention span, understanding, and memory (TR 149). She has difficulty handling stress, following authority, and being in closed spaces or isolation (TR 150). She complaints of difficulty managing anger and social withdrawal (TR 149).

(Plaintiff's Brief at 11-12.)

As to Plaintiff's activities of daily living and social functioning, the ALJ found as follows:

> In activities of daily living, the claimant has mild restriction. In her Adult Function Report, the claimant indicated that she is independent in matters of self-care and personal hygiene, although she requires reminders for these activities. (Exhibit 5E/2-3). The claimant is able to prepare meals, shop for necessities, and count change. (Exhibit 5E/4). For reasons she could not explain, however, the claimant performs no household chores or yard work. (Exhibit 5E/3-4). Yet, elsewhere in the record, she complains of compulsive cleaning patterns. (Exhibit 3F/2). The claimant reported that she does not possess a valid motor vehicle operator's license, but the record indicates that the claimant drove to at least one assessment. (Exhibit 11F/1).

In view of the foregoing, I find that the claimant's mental impairments impose a mild limitation on her activities of daily living.

In social functioning, the claimant has moderate difficulties. The claimant reports that she regularly spends time with others via a computer. (Exhibit 5E/5). In addition, she visits her mother on a daily basis. (Exhibit 5E/5). The claimant, however, endorsed difficulty interacting with family, friends, neighbors, and others due to her alleged anger issues. (Exhibit 5E/6). Despite her alleged anger issues, the claimant reported no difficulty at school and no legal involvement. (Exhibit 8F/1, 11F/2, 21F/1, 3). The claimant has a boyfriend. (Exhibit 21F/3). During a psychological consultative examination, the claimant was adjudged to be moderately deficient with regard to her social interactions with the examiner. (Exhibit 11F/4). Accordingly, I find that the claimant's mental impairments impose a moderate limitation on the claimant's social functioning.

(R. at 14.)

In an undated Adult Function Report, Plaintiff did not report any problems with personal care. (R. at 145.) She reported that she did not do any household chores, but she could not explain why. (Id. at 146-47.) Plaintiff could count change, but could not use a checkbook, handle a savings account, or pay bills. (Id. at 147.) Likewise, during his April 29, 2010, evaluation of Plaintiff, Dr. LaVoie, Ph.D., noted that Plaintiff attended church with her current boyfriend and was a senior in high school. Plaintiff did attend some special education classes but had switched to Home Bound instruction after some "depressive episodes." (Id. at 630.)

On May 3, 2010, Thomas C. Stein, Ed.D., completed an Adult Mental Profile of Plaintiff. During that evaluation, Plaintiff stated that she was in twelfth grade, was "homebound," and attended school two (2) nights per week. (Id. at 247.) Prior to receiving homebound instruction, Plaintiff had attended special education classes, had not been suspended, and had not repeated a grade. (Id.) She had also been involved in Students Against Drunk Driving. (Id.) Plaintiff told Dr. Stein that her daily activities involved walking her sister to the school bus, phoning and visiting with her boyfriend, occasionally cleaning and doing laundry, and occasionally grocery shopping with her mother. (Id.

at 247, 249.) She regularly visited friends and relatives, occasionally socialized with friends and neighbors, and occasionally attended church. (Id. at 250.)

Dr. Stein completed a Mental Status Examination of Plaintiff on May 2, 2011. Plaintiff reported that she had graduated high school in 2010, received Bs and Cs as grades, and was in special education classes. (Id. at 460.) As to her daily activities, Plaintiff stated that she cared for her personal hygiene, fixed and ate breakfast, cleaned the kitchen, and visited with her mother and boyfriend. (Id. at 462.) She did laundry, regularly visited with relatives, occasionally socialized with friends or neighbors, and occasionally dined at restaurants. (Id.) Months later, on September 14, 2011, Ms. Patricia K. Haddix completed a Clinical Update of Plaintiff. She noted that Plaintiff had been awarded HUD benefits to obtain housing, but that she had lost those benefits when it was discovered that her boyfriend was living at the residence. (Id. at 645.) Ms. Haddix specifically found that Plaintiff did not need assistance in homemaking, self-care, or independent living. (Id. at 647-48.)

The only evidence contradicting the evidence set forth above is Plaintiff's testimony at the administrative hearing. At the hearing, Plaintiff testified that she required "extra help" in her math, reading, and English classes at school. She had difficulty handling money because she did not "know the right amount to give someone." (Id. at 38-39.) Plaintiff had lived alone for a year in 2010, but testified that she ended up moving because if she continued to live on her own, she would "end up killing" herself. (Id. at 46-47.) However, the ALJ determined that Plaintiff's testimony was inconsistent with the record evidence. (Id. at 18.)

Given this, the undersigned finds that the record demonstrates that Plaintiff is able to communicate, take care of herself, take care of housework, maintain social relationships, and enjoy leisure activities. Although Plaintiff is limited in the academic setting, the record shows that Plaintiff

has some functional skills in that area, including some ability to read and write. Accordingly, the undersigned finds that the ALJ's decision that Plaintiff does not meet the first prong of Listing 12.05C is supported by substantial evidence. Given this, Plaintiff cannot meet Listing 12.05C, see Hancock, 667 F.3d at 475; however, the undersigned has addressed Plaintiff's argument regarding her IQ scores below.

### 3.    Valid IQ Scores

"In cases where more than one IQ is customarily derived from the test administered, *e.g.*, where verbal, performance, and full scale IQs are provided in the Wechsler series, [the Social Security Administration] use[s] the lowest of these is used in conjunction with 12.05." 20 C.F.R. Pt. 404, Subpt P., App. 1, § 12.05C; see also Rainey v. Heckler, 770 F.2d 408, 410-11 (4th Cir. 1985); Grant v. Schweiker, 699 F.2d 189 (4th Cir. 1983). An ALJ may commit error by rejecting IQ scores that support a finding of intellectual disability. See Rineholt v. Astrue, 617 F. Supp. 2d 733, 744 (E.D. Tenn. 2009). However, the Fourth Circuit has noted that "[a] valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record of the claimant's daily activities and behavior." Hancock, 667 F.3d at 475 (quoting Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992)); see also Brown v. Sec'y of Health and Hum. Servs., 948 F.2d 268, 270 (6th Cir. 1991). Accordingly, "[t]est results must be examined to assure consistency with daily activities and behavior." Hancock, 667 F.3d at 475 (quoting Popp v. Heckler, 779 F.2d 1497, 1499 (11th Cir. 1986)).

On April 29, 2010, as part of his Clinical Evaluation of Plaintiff, Dr. LaVoie administered the WASI assessment. (R. at 630.) Subsequently, Dr. LaVoie noted: "She made what seemed to be a good effort, and the results are believed to provide a valid estimate of current functioning. The full

score was 62 (with a 95% confidence interval from 59 to 67), at the 1ˢᵗ percentile and in the range of mild mental retardation." (Id. at 631.) However, he later stated:

> Testing and assessment results indicate intelligence in the range of mild mental retardation; it is believed this may be an under-estimate. She seemed to make a good effort, but her presentation appeared to suggest a higher level of ability. Achievement testing produced an average score (81.25) about 20 points higher than her estimated ability. I believe her true ability is in the borderline range; that is one of the reasons her mild MR diagnosis is made provisionally.

(R. at 632-33.)

Days later, on May 3, 2010, Dr. Stein completed an Adult Mental Profile of Plaintiff. As part of this, he administered the WAIS-III assessment. (Id. at 247.) From that, he determined that Plaintiff's verbal IQ was 74, performance IQ was 64, and full scale IQ was 67. (Id. at 248.) Dr. Stein noted that "[w]hile the IQ Full Scale score of 67 would suggest mild mental retardation, I think a more accurate interpretation of this is that she functions within the borderline range of intelligence." (Id.) He did note that both internal and external validity were "good." (Id.)

In her brief, Plaintiff argues that "[f]irst, the ALJ improperly marginalized the importance of the WAIS-III results (64 performance IQ, 67 full scale IQ) simply because the examiner opined that 'although the claimant's scores suggest mild mental retardation, a "more accurate interpretation" would be that she functions in the range of borderline intellectual functioning range.'" (Plaintiff's Brief at 9.) According to Plaintiff, this is error "because the ALJ imposed a requirement that simply does not exist in the language of Listing 12.05(c)–the requirement that the examiner specifically diagnose mental retardation over borderline intellectual functioning." (Id.) Plaintiff also argues that the ALJ "improperly undermined the importance of the WASI results (62 full scale IQ) because the examiner opined that the scores 'may represent an underestimate of her ability.'" (Id. at 10.)

33

After reviewing the record, the undersigned notes that during her assessment with Dr. Stein, Plaintiff reported that she personally cared for her hygiene, visited with her boyfriend, occasionally cleaned and did laundry, occasionally attended church, regularly visited friends and relatives, and occasionally socialized with friends and neighbors. (Id. at 247, 249, 250.) Dr. Stein notably stated that Plaintiff was only mildly deficient in her social interaction with him. (Id. at 250.) During her assessment with Dr. LaVoie, Plaintiff reported that she attended church with her boyfriend. (Id. at 630.) Furthermore, both examiners suggested that Plaintiff's full scale IQ scores were underestimations of her ability. Given this evidence and the ALJ's findings regarding Plaintiff's daily activities and social functioning, the undersigned finds that substantial evidence supports the ALJ's determination that Plaintiff's full scale IQ scores were not valid. See Hancock, 667 F.3d at 475.

In sum, Plaintiff's argument fails. The undersigned does note, and the parties do not contest, that Plaintiff meets the requirement of having an additional impairment. However, after a review of the record, the undersigned concurs that Plaintiff did not establish deficits in adaptive functioning prior to the age of 22. Furthermore, the ALJ properly determined that Plaintiff's IQ scores were not valid. Accordingly, the undersigned finds that substantial evidence supports the ALJ's decision that Plaintiff did not meet the requirements of Listing 12.05C.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's application for Supplemental Security Income is supported by substantial evidence, and I accordingly recommend that the Defendant's Motion for Summary Judgment be **GRANTED**, and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Gina M. Groh, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record

Respectfully submitted this _17_ day of _September_ , 2014.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE